I appreciate your enthusiasm. You're ready to go. You can start whenever you're ready. Thank you, Chief Judge Traxler, and may it please the Court. Mr. Modanlo's conviction should be reversed for multiple independent reasons, the first of which is that his constitutional between prosecution and the District Court. Issues were litigated and decided against Mr. Modanlo, not only without his participation, but often without his even knowing that the litigation was taking place. Resulting rulings included some that determined whether the trial would go forward, and some denied Mr. Modanlo of the benefits of rulings he had What is so remarkable about this is not just the casual use and sheer volume of ex parte communication, and not just that there was no justification for it, or frankly even a proffered justification, but that the very existence of most of the ex parte communication was kept secret from the defense. That means that Mr. Modanlo not only had no ability to participate in the litigation of the issues, he had no opportunity to argue that he should be permitted to participate. We submit that this is not an acceptable state of affairs in a criminal trial conducted in an American courtroom. Mr. Modanlo and the government disagree about many things, but there are a number of principles governing ex parte contacts that we think are not subject to reasonable dispute. One is that they should be rare. Another is that they require a showing of extraordinary need. A third is that even when that showing is made and found to exist, the excluded party must be told that the ex parte communication is taking place, at least in the absence of very unusual circumstances. For example, when there is a risk to the safety of a witness or a juror. Each of these principles was violated here. There were nearly 60 ex parte contacts in this case, or at least that's the number we know about. With respect to almost all of them, there was not even an attempt to justify proceeding without the participation of the defense, much less an actual justification. And with respect to almost all of them, there was not even an attempt to justify the failure to apprise the defense of the communications again, much less an actual justification for the secrecy. To take just one example, the prosecution was told on a Tuesday to apprise the district court and the defense by Friday whether it would be able to go forward with the trial. On Thursday, the prosecution decided that it would be unable to meet the Friday deadline, rather than doing what one would think that any litigant would do in that circumstance, which is to contact the court and notify the opposing party that the court was being contacted and what the request for relief was. The prosecution simply picked up the phone and called Chambers and asked for and obtained an extension. Mr. Maldonado, the defense wasn't apprised of this until after the fact. And this isn't just any litigant. How was that explained? I'm sorry, Your Honor? How was that explained? I don't know that there was any explanation. An ex parte continuance of a response, I think that's what you characterized it as, that was due. Right. There was no explanation. Was it explained after the fact? No, and it's never been to this day. There's no explanation in the record? None. And there's none, there's none. They didn't call the judge, they called the law firm. Well, they called Chambers. We don't know exactly what happened and that's part of the problem with the ex parte. It wasn't an email, it was a telephone call? Yes. So the oral communications can't be reconstructed and that's one of the problems with the ex parte communication. How much of an extension did they get? Well, they got an extension until Monday, at which point they... That wasn't much. It wasn't, but the context for this is that Mr. Maldonado had invoked the speedy trial rights from the start of this case. The government was having trouble doing it. Mr. Maldonado opposed adjournment to the trial date at every turn. One was granted over his objection and when it was granted, the district court made clear that there would be no further extensions, no further adjournment to the trial date. At this Tuesday hearing, the government said, we're still having problems, we'd like another adjournment. The court said, no, tell me on Friday whether you're going to be able to go forward. So in this context... They were going to go forward with the trial or whether they were going to, what, dismiss the case? Yes. So in this context... Pretty big decision. I'm sorry? Pretty big decision. Absolutely. And that's not the only outcome determinative ex parte communication that we have in this case. Well, let's stay on this one for a minute. How long before the trial date did this Thursday through Monday transaction take place? I think it was a couple of weeks. A couple of weeks. Check that. I think it was less than a couple of weeks. Ultimately, when the adjournment, second adjournment was granted, it was a two-week adjournment that was granted. Was it late March? I believe so, yes. The trial started on April 22nd or 23rd? The trial started in late April, that's right. So in between there, there was a three-week delay? This was, the request was made on March 20th, which was a Thursday. The original due date was for the representation as to whether the case would leave was March 21st. The case was ultimately in order. Continuing the trial again was entered on March 25th. The trial commenced on April 23rd. So we're about a month away at that point. But weren't you told the next day about the continuance? Weren't you told on Friday? Yes, yes. So what you're saying, they should have filed a motion for continuance if that's what they wanted? Well, they should have proceeded the way anybody you would think would proceed in an American courtroom, which is to file a motion to serve it on you. Exactly, exactly. And again, this is just one example. Alternatively, they could have called defense counsel, said, we're supposed to report to the judge by Friday, but we need the weekend to think about it further. Do you have any objection to that? I mean, that's, in an ideal world, that's how it would have happened, right? And almost certainly, defense counsel would have said, of course you have until Monday. I don't know. I don't know that that's true. In the District of Maryland, a defense lawyer would have said, of course you have until Monday. Well, again, Judge, I don't know what happens elsewhere. In the context of this case where we had been, you know, vigorously invoking our speedy trial, right? I understand that. But you haven't raised the speedy trial issue in this appeal. That's true. Okay. So again, I'm staying on this is because you raised this one, which I assume, maybe I shouldn't, this is your most serious, substantial ex parte claim. I don't want to tell you that it's our most serious. I think in a way, in a way, in a way, it's the most egregious, and it is the most representative of what happened throughout the course of the trial, that the government would proceed in this way. I think speak volumes. I absolutely agree with you on that. And as I suggested, what should have happened, phone call to defense counsel, any problem? Judge expects to hear from us on Friday? He would have said, yes, there's a problem. No, you wouldn't have. Well, let me, let me. And even if you had, no I would deny the government a weekend to reassess its position on whether to dismiss a case when the trial is four weeks off. Let me, I mean, let's, let's be practical and real here. Let me, let me respond to that in a slightly more general way, if I could. I want to be specific. Because again, you raised this one. Of all the ex parte contacts you could have raised, this is the one you focus on. Right. I think what your line of questioning is getting to ultimately is the question of presence. Of course. And I'd like to speak to that if I could. It's our, as far as prejudice is concerned, it's our submission that we don't have to show prejudice. Okay. Because this is a structural error. The whole course. Now, obviously my question impliantly asks you to assume I don't agree with that proposition. Okay, that's fine. That's fine. You don't have, you don't have to. I'm looking for, I'm looking for prejudice. I guess I would. We've got a precedent that goes the other way. I think I was involved in the case called RZS Holdings or something? That's absolutely right, Judge King. It says you have to show prejudice. Right. But the, but, but anyway, so, so even if you're right here that there were pervasive improper ex parte contacts, you're going to have to show prejudice. Well, we don't think we do. But as I said, you don't, you don't have to. We can't over, this panel can't overrule the prior. Well, I mean, maybe, maybe the opinion's wrong. Let me say a couple things about RZS Holdings if I could. The first is that it was a civil case. So it didn't implicate any of the 5th and 6th Amendment criminal trial procedural rights that this case does. The second thing about RZS Holdings is that it was a due, it was a civil case and the only constitutional right at issue was due process, which doesn't give rise to structural error in the same way that the rights at issue here do, which are right to counsel during every critical phase of the proceedings. So you're saying it's distinguishable. I'm saying it's distinguishable. You can make that point. Right. You can, absolutely. That's a good, that's a valid argument to make. There's no question about that. But, but that case, we, we did require prejudice. You did. And the second point I would make is that even if you think RZS Holdings applies here, we should still win because the critical part of RZS Holdings, as far as we're concerned, is what prejudice means in the context of error resulting from ex parte communications. It doesn't mean that you have to show that the result of the trial would have been different and that there would have been an acquittal. It doesn't even mean that you have to show that the outcome of the particular proceeding within the course of the trial, the particular ruling would have been different without the ex parte communication. All it means, as this court said in that case, is you have to show that you were deprived of an opportunity to meet and oppose the claim of the other party. That is indisputably the case here as to all of the issues we raise on appeal. Let me take you back to where you were before. See, Judge Davis's suggestion is right on the money. What should have happened is they should have called you and asked you whether you would agree to something. If you said no, they could then have asked you to join a telephone call to the court for a telephone conference. Or they could have chosen to file a motion and give you notice and say it's going to be heard promptly, maybe by telephone or something. But they chose not to do any of those three. They chose to go directly to the court. That's what you're getting at, isn't it? Yes, absolutely. Right, but what Judge Davis suggested is the reasonable way to do it, and that's the way it would be done in 99% of the situations. I mean, I've been in your shoes and I've been on the prosecutor's shoes, too, and we used to talk to each other about these things. That's right. The courts expect us to. I don't disagree with anything you're saying. And this is obviously not the only ex parte contact that occurred here. There were close to 60. And the ones that even the government concedes are substantive ex parte communications fall into three basic categories. The first has to do with a discovery request by Mr. Madanlo for MLAT correspondence. A lot of this evidence, as I've said, came from overseas. That's that overseas stuff? That's right. This was the documentary evidence that came from overseas. There is a request for assistance made to the Swiss and the Russians, and they provided documents. And Mr. Madanlo, before trial, said, we'd like to see the correspondence between Department of Justice and these foreign governments. And there was motions practiced on that. And the court issued an interim order on that motion and said to the government, give me all of the MLAT correspondence. I'll take a look at it in chambers. And the government didn't do that. It submitted exemplars. It didn't give the judge all the correspondence? That's right. And it did that without notifying the defense or the public in any way that it was doing that. It did that. You're saying it disregarded the court order? That's right. It disregarded the court order. It submitted only exemplars. The court then issued an order without our having known that this was done, without our having any ability to tell the judge, enforce the order that you issued, this ruling that we won, without our even knowing that this was taking place. The court denied our request for discovery, and it issued an order that we submit compounded the problem because it said— You're saying the court reconsidered and changed its ruling? It did not say that. No, but it effectively did that. Effectively it did. But it did that without any public notice. Without your input. As a result of an ex parte proceeding, it changed its ruling. Right. What should have happened, if the government didn't want to do what it was directed to do, that it should have filed a motion for reconsideration. It didn't do that. It just took it upon itself to do something different. District court allowed it, and it denied us relief. And then, as I was about to say, in denying us relief— Couldn't they have had a classified hearing on the record? No, that's a separate category of ex parte communications, which I hope I can get to. But here, in denying relief, the district court issued an order that said, I have reviewed all of the— I directed the government to provide all of the correspondence. I have reviewed it, and I'm denying the defense access to it. So that's the first category. The second category involves a different subset of foreign evidence, and this was— You're saying the court said it had reviewed all the correspondence? Yes. But it hadn't? That's right. Because we now know, as we're trying to put the record together after sentencing, and after Mr. Badanlow had surrendered and was sitting in prison, when we're trying to put the record together on appeal, we learned about this and all the other ex parte contacts. The second category of evidence involves foreign testimonial evidence, what the parties refer to as the Swiss depositions. This was one of the most hotly contested issues before trial. This was one of the most important categories of evidence that the government offered, as was also the case with the documentary evidence from Switzerland. The government, throughout the course of pretrial proceedings, made it clear to the court that without this evidence, it probably wouldn't be able to go forward. It moved to take depositions of Swiss witnesses. We opposed it. The court directed the government to do a number of things, one of which was to give the court assurances that the Swiss witnesses would not invoke any privileges. The government, we now know, made an ex parte submission to the court, unsolicited, that addressed, we have not seen it, but as far as the government's briefs on appeal suggest, it had something to do with difficulties in obtaining statements and testimony from Swiss witnesses, and the possibility that they would be invoking privileges. We didn't know anything about it at the time. We weren't able to oppose it. We didn't know about it until the appeal. The court ultimately granted the motion to take the Swiss depositions, and as a consequence, the trial went forward, and we know what happened at the end of the trial, which is why we're here today. If we had known about it... Sorry, and really, I don't want to spend more than 20 seconds on this. What was the basis for the opposition to the deposition? Essentially, that the government couldn't satisfy the Rule 15 standards, that the testimony was irrelevant, that the witnesses could actually appear at trial. There were privilege arguments, all sorts of challenges. Privilege? Didn't it raise privilege? Well, we were arguing that the deposition shouldn't be allowed because there were privilege problems as a matter of Swiss law that would prevent them from actually being used, and that is part of the reason that the judge asked for this representation. Okay. Again, I didn't want you to take up a lot of time. So as far... Again, I don't want to belabor this point. Our primary submission is that this is structural error, but again, you don't have to agree with me on that in order for us to win. As far as the prejudice is concerned, I just want to say two things about that, if I could. That's sort of a high level. The first is that if this is not structural error, at the very least, if prejudice is relevant, it's the government's burden to show an absence of prejudice. The Sixth Circuit cases which reverse criminal convictions on which we rely make this clear. Ordinary principles of constitutional harmless error make this clear. It's the government's burden to show harmlessness beyond a reasonable doubt. So that's the first part. It's not our burden to show prejudice. It's the government's heavy burden to show an absence of prejudice. The second point I just want to emphasize is one I've already made, which is that in this context, unlike in many others in criminal cases, prejudice does not mean show that the result would have been different or since it's the government's burden, show that the result would not have been different. Whether that applies to the trial as a whole or to any particular part of it, it just means show that you didn't have an opportunity to meet and oppose the arguments you were making. Harmless error or a lack of prejudice in this context, and the RZS decision makes this clear, discussed the Seventh Circuit decision which found a lack of prejudice. What that means in this context is there is an ex parte contact, but despite the ex parte contact, the excluded party still had an opportunity to participate. For example, where one party makes an ex parte submission to the court and before doing anything with it, the court apprises the other party and gives it an opportunity to be heard. None of that happened here. We are completely on the other end of the spectrum from that. As far to be... Aren't there sealing rules up there in the local rules of the Maryland court? And how you go about things if you want to seal them up? I'm not sure whether the local rules specifically address that. I would say that I think the case law and general principles of trial procedure and criminal procedure make clear what you're supposed to do. If you want to make an ex parte submission... You're talking about the Washington Post case? Yes, that line of case. Judge Murnahan's case. I believe so. Judge Murnahan wrote it. I mean, it's from this court, what I'm thinking of. Right. Probably Washington Post got his name on a lot of stuff. Right. I mean, you have to apprise the opposing party in some way by publicly docketing and serving the fact that you are making this request ex parte. You have to make a showing that justifies it. The district court has to make a finding that it's justified. A record has to be made. None of that happened here. Now, just to speak a little... Did they ever... So in my understanding of geography, none of this stuff was even put in the record at all. Until post-judgment, after sentencing, when you all supplemented the record after the appeal was filed. That's absolutely correct. And to this day, one of the problems with this is that we don't know for sure what's really in the record that occurred during the course of the proceedings and what isn't. I mean, the government concedes that oral communications with one or two exceptions couldn't be reproduced. So we don't know what the substance of oral communications was. It did an email search, but only as to communications between chambers and some subset of the prosecutors, not all of them. So we... You said there were letter briefs, your brief argues about letter briefs that were submitted to the court. Right. Ex parte. Yes. And were never filed or docketed in the record. Well, they're now in the record. But they weren't sealed or anything and put in the... They weren't... Where were they kept? In the U.S. Attorney's file or in the judge's file? Yeah, I assume that they were in the district court's file and the prosecution's file. And then when it came... But they weren't in the district court file because the district court file would be part of the record. Well, not in that formal public sense. Not in the clerk's file, you mean. Right. Not on the public electronic dossier. The public clerk had a file where he kept stuff. That's right. I don't know. So the prejudice here, it seems to us, is sort of multi-layered. The first is that we couldn't meet or oppose the arguments because they were ex parte. The second is that because we didn't know they were taking place, we couldn't make the argument that we should be allowed to meet and oppose them. Because we didn't know they were taking place, we couldn't seek more generalized relief from the district court, which ranges all the way from saying, please don't do this anymore, to asking the judge to grant a mistrial or recuse himself, and then all points in between. And as I've just been discussing with Judge King, we also have the problem that this appeal is necessarily being prosecuted on an incomplete record. And I mentioned two categories of ex parte communications. The third has to do with the Nassiri evidence. Nassiri was a co-defendant in the case who provided exculpatory information to the government when he was interviewed. The government interviewed him a couple of years before the disclosure was made. The government was not going to disclose it on its own. It submitted the information to the district court a few days before trial began and asked the district court to make a determination as to whether it needed to be disclosed. That was done ex parte, without any notification to the defense. It wasn't documented. So we had no idea that the request was being made. The same day- An appropriate procedure, in your opinion, for the government to submit evidence to the judge to ask the judge if it appears to be exculpatory? It's completely appropriate. It's completely appropriate. What we think the government did wrong was in not docketing it so that the public and the defense didn't know that it was taking place. And that matters. That was critically important, as it turned out here, because- You mean the Nassiri memorandum, when they sent it to the judge, they said, as in you copied the transmittal letter or email, that you know they were sending something to him? Either that, or frankly, the more appropriate thing to do is to make a submission. I mean, the way sealed documents are filed all the time, you file it publicly and electronically. And if it's ex parte, the public and the opposing party just see this sort of blank electronic entry that shows that this happened, but it doesn't show what the substance of it is. They were confusing the term in camera with the term ex parte. Absolutely. That's absolutely right. And in camera, there's nothing wrong with an in-camera inspection of evidence in appropriate circumstances. What's wrong is that the other side's supposed to know that it's taking place. So the judge, there was an ex parte undocketed request for a decision as to whether it needed to be disclosed. The same day, the judge directed the prosecution to turn it over. But they didn't turn it over the same day. They waited until a few days after trial had commenced, at which point we knew about it for the first time, and we made all of our arguments under Brady. The problem with the timing of this is that at that point, as a practical matter, there was really nothing we could do about it. In between that time the jury was sworn, you claim that prejudiced you? That ought to run against the government that the jury was sworn in. Well, the problem is that if we had known about this when we should have, which was at the very latest, a few days before trial commenced, frankly, we think we should have known about it months, if not years, before trial. The judge ordered them to turn it over before the trial. That's right. Before the jury was sworn in. That's right. But they didn't turn it over. They swore a jury and then got it. That's right. I mean, they should have turned it over months, if not years earlier. But at the very least, they should have turned it over before the trial commenced. Once you had an impaneled jury, Nasiri was abroad. Right. If we were to get- They had this statement for three years, but they said they didn't see it until just before the trial started. Didn't see this part that was deemed exculpatory. Maybe they say that that can't- The judge said they acted in good faith on that, didn't he? Well, I mean, that can't be a justification for waiting until the 11th hour to make an untimely disclosure of Brady. If it's in the government's possession, I think it's an objective standard. Brady doesn't care whether it's good faith or not. If it's exculpatory, you're entitled to it. Well, at the very least, if it's in the government's possession, I don't think it's a defense to a Brady claim that this one particular prosecutor- Prosecutors are busy. There's no question about it. But it's not a defense to a Brady claim to say, well, this particular prosecutor just happened not to have focused on this until the day before trial. If it's in the government's possession and it's been in the government's possession for months or years, it seems to us there's not an obligation to turn it over. So that was, in connection with the Nasiri memo, that was the first ex parte contact. The second was after there was a hearing on this and the judge expressed a lot of concern about it and said, this is clearly exculpatory. I'm exploring all of my options as far as remedies are concerned. I believe the next day or maybe later the same day, there was another ex parte communication with chambers from the government, this one by letter, not by email, in which it said, can we have a hearing? This was, I think, on Thursday or Friday late in the week. I'm going to bring our national security specialist from our office. And the court said, yes. We didn't know about this until the Monday morning of the day when the hearing occurred. So we showed up at this hearing not knowing what it was about in any meaningful way, not having had the opportunity to prepare. And during the course of this hearing, a third ex parte, just in connection with the Nasiri memo, a third ex parte proceeding occurred. The judge and the prosecution, including the national security person from the office, went into a closed hearing, which was not transcribed. The judge had been considering as a potential remedy directing the government to turn over the entire memo, which was a 15 or so page memo.  This ex parte hearing occurred. And when the judge came out, he said, on the basis of what I've just been told, I'm not going to direct it, the entire memo to be turned over. Was in the record whether the memo was classified or not? I think everybody agrees that the memo itself was not classified. The government's position was that what this national security official from the Justice Department had to tell the judge was itself. That was classified. That's right. That was off the record. There was no court reported there. That's right. There was no court reported there. And what happened in that hearing was reproduced by the government, I think, 17 months after the fact. Again, not until this appeal was noticed. And we're trying to put the record together. Sorry? It was part of that rule 10E. That's right. That's right. So those are the three, I think, the three most important categories of ex parte communications, which we say violate Mr. McDaniel's constitutional rights. There was no justification for them. There was no attempt to justify them. And with respect to the vast majority of them, we didn't know about them as they were happening. So we lost the opportunity not only to meet and oppose them, but even to argue that we should be able to meet and oppose them. We think that that structural error, even if you disagree with me about that, we think the prejudice standard can't possibly be satisfied by the government. I'm not sure exactly whether I have any rebuttal time left at this point. But if I do... But you're doing so good, I didn't want to interrupt you. If I do, I hope I'll have a few minutes. Okay. Thank you. All right. Let's hear from the government. Thank you very much, Mr. Chief Judge. May it please the Court. My name is Sujit Raman. I'm the Appellate Chief for the District of Maryland here on behalf of the United States. Your Honors, I would like to begin with this discussion of the ex partes and emphasize at the outset, I am not aware of a single case. And the defendant certainly has not cited any cases. Where a court of appeals has reversed a criminal conviction, let alone after a six week trial, based on ex parte contacts relating to discovery disputes, especially where defendant has not challenged any of those discovery rulings on appeal. That's perhaps our primary and strongest argument on the ex parte issue. And why is that? It's because discovery does not concern, quote, a critical stage of the proceedings. Let alone, as the panel in Rines, a case decided a few years ago, a case I know Judge King is very familiar with. Did you say two years ago? Several years ago, in the late 90s, Your Honor. The panel decision in Rines. Right. Where the court said, quote, the presentation of, or admissibility of, evidence during an ongoing trial. That is a critical stage of the proceedings. But discovery, pre-trial discovery, is not a critical stage of the proceedings. Indeed, this was not a situation where, quote, the opportunity for effective defense must have been seized or foregone. Some of this stuff went on during the trial. You had the, you had that, he was talking about. The ex parte about the pacifier. The ex parte thing, where you, the order to turn it over, the exculpatory stuff. The allegedly. You got a reconsideration or something. Yeah, not quite, Your Honor. Over the weekend. Yeah. And didn't tell them about it, but you swore the jury in. That's right. There are a number of different issues, Your Honor, and I think it's very important. We've tried in our briefing to lay out each of the ex parte situations, because they're distinct and they're important to consider separately. Is that the way you all do things up there in all your cases? Well, Your Honor, I should emphasize that if you look at the docket in this case, it is hundreds of docket entries. Everything was had in open court, except for a handful of contacts. Now, I'm not talking about the 45 emails with the law clerk, which are purely logistical, purely non-substantive. I think everybody would rate parties engaged in those kinds of non-substantive. Or even those. Why wouldn't you just copy the other side also? Yeah, we probably should have been making sense. We probably should have. You know, I'm not here to sometimes. Sometimes the government should start by sort of apologize. Yeah, well, I'm sure this isn't one of those cases. Your Honor, I am more than happy to stipulate that we would prefer not to be here today talking about the 45 emails. It probably wouldn't have been a hard thing just to copy the other side. No dispute about that. But, you know, there's no serious prejudice to the defendant. Did you provide me an extra copy of the pleadings? Please delete the prosecutor from the docket. None of that affected Mr. Madonlo's rights in any serious way. And indeed, Mr. Madonlo. That's kind of innocuous. Yeah. Certainly, we'd agree with that. But there's nothing wrong with letting the other side know about it in a big criminal case. I don't dispute that, Your Honor. There's lawyers in the case. I always thought you'd tell the other lawyers what's going on. Right. And for the most part. Particularly when you're communicating with the court. For the most part, we did. You know, and again, I don't want to take up my time on the court. Now in West Virginia, we used to call these things writs of back doors. Writs of back doors. Well, we certainly. We took it as a writ of back doors. Right. And changed it around. Well, we're not asking for any kind of dispensation like that, Your Honor. There's no dispute that proceedings should be open. But, you know, those aren't proceedings. And I guess that's my point. When a law clerk emails the prosecutor or the defendant, which he did, by the way, there are emails in the record where the law clerk, who is diligent, trying to do his job, essentially said, hey, I need, you know, I need a copy of this or I need a response to that. He didn't talk anything about those communications. Well, of course he did. Yeah. So let's focus on the substance. Now, you know, we break it down and there are a couple of different ones. The Brady Giglio contacts. You know, I am proud to stand here and say the prosecutor acted exactly correctly. Pardon? He acted exactly correctly. Well, he did not. Well, I think he did, Your Honor. Well, he didn't. You cite in your brief that the U.S. Attorney's Manual says you can submit stuff to the judge in camera. That's right. Well, that doesn't mean you do an ex parte. Well, I... You tell the other side you're submitting it to the judge, but you don't show the other side what you're giving to the judge. But you've got to communicate that you're giving something to the judge. I don't want to be hyper technical about this, Your Honor. It doesn't say in camera ex parte. It says in camera. It's the in camera review to see whether... And you can say, we don't think there's an exculpatory, but we want you to take a look at it. We're not going to turn it over unless we're ordered to. But they're entitled to know that you're doing through that. You're jumping through that hoop. I'm looking at Rule 16, Your Honor. Rule 16D, titled Regulating Discovery. At any time, the court may, for good cause, deny, restrict, or defer discovery, et cetera. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. Ex parte. If relief is granted, the court must preserve the entire text of the party statement. How do you show this in the record? None of this stuff was in the record. The reason it's not in the record is because the district court ordered disclosure. And that's why this case is different than every one of the other cases cited. Disclosure, it shows up in the record. You've got to have a record. I don't dispute the fact, Your Honor, that going forward, it would certainly be best practice for everyone. You had briefs, or they call them briefs, that weren't in the record. Yeah, well, let me address each of them, Your Honor, because you've got to categorize it. You know, the Brady stuff. Hearings that weren't in the record. I'm sorry, Your Honor? You had hearings that weren't in the record. Well, let me emphasize the Brady issue first. I mean, as David said, maybe you ought to start with an apology. I think you need to show us where the, I think you need to deal with how you know they're not prejudiced. Yeah, well, there's no prejudice. You need to say it's not structural error. Right. And it's hard to, you're not going to get too far, I don't think, saying you didn't do it right, or you did it right. Let me explain why there is no prejudice in this case, Your Honor, as Your Honor has observed. That just goes on all the time, though. Well, no, no, it doesn't go on all the time. I mean, look, logistical types of contacts do happen all the time. You've got a big office up there, hundreds of criminal cases. That's right. But I guess the point I'm trying to make— There are ceiling provisions in your rules, in the local rules. So, Your Honor— There are ceiling provisions. I looked in the local— You have the Washington Post case. Yeah. The Judge Bernahan wrote a great jurist who's back here on this wall. That's right, that's right. In 1986 from Maryland. A couple things— Right. Well, there are a couple things about the Washington Post case, Your Honor. First of all, that is a First Amendment case. And the issue in that case is, did the public, the Washington Post, have access to certain materials regarding a plea hearing and a sentencing? The relief in that case— And this is one of my most important points, Judge King. The relief in that case was not to vacate the conviction. The relief in that case was to open up the docket and to make the transcript for that plea hearing available to the public. Here, all of that information is available to the public. All of it is in the joint appendix or the party's supplemental appendix. All of these letters, except for brief redactions which relate to work product, which we've asserted then and we continue to assert now, is open to the public. So, the relief in Washington Post— Open to the public now. Yeah. But not during the trial. A year and a half after the trial was open. Well, I guess— The point about Washington Post— As I say again, first of all, Washington Post, I think, very clearly— During the course of the trial, there was nothing put in the record where you all made a request to go in camera— That's correct. —for an ex parte proceeding. And there were no findings made by the judge that that was justified. So, we're going to have this ex parte proceeding, which I'm going to hear from the national security man and get an explanation of what all this is. And so, my point— would really make his record look better. I think the members of the bar would certainly profit from an opinion from this court that clearly lays out exactly how this process should play out. The reason I say this, Your Honor— There are rules on how things should play out. I have— The Washington Post case lays out one, two, three, and you have sealing rules. We have sealing rules. That's right. We pattern after Judge Bernahan. That's right, Your Honor. For how things are sealed and how you redact and what you do when you have that sealed stuff on appeal. The local rules in Maryland, Your Honor— and perhaps you and I are just looking at different provisions— I don't see anything in the local rules that requires a prosecutor, when seeking to submit Brady information to the district court, to docket that information. In fact, Rule 16, as I've said, in the GENCS Act, which also talks about ex parte review of material. You're saying you can have a hearing up there and submit a brief without docketing it. It's not a hearing, Your Honor. Well, you know— You had hearings and didn't docket them. I don't think— Well, you had to go back and create or try to create what happened because you didn't have a court reporter. Let me focus on the Brady-Giglio issue because you've got a really— That CFA requires you get a court reporter. Well, quite. I mean, Your Honor, I do want to just focus one thing at a time. The Brady-Giglio issue. The prosecutor, when he sensed that there might be something arguably exculpatory, did the responsible thing. He went to the district judge and sought a ruling. And Judge Mazzetti, rather than, as the defendant asserts, was sort of in a joint enterprise with the prosecutor, no, Judge Mazzetti said, turn this thing over. And with the Giglio information, the prosecutor produced it immediately. The next day, he sent a letter. There's no dispute about that. You're talking about the thing a year earlier. No. No, no. I'm talking about two weeks before trial. The Giglio stuff. The Giglio stuff. The Giglio stuff was way back when. The Brady stuff was this area. Yes. So on April 22nd, the prosecutor reviews his files again, as any responsible prosecutor should. And said, you know, there is this one sentence about the MESBA satellite program, which is completely different, by the way, than the SINA program, which is what was charged and convicted at trial. He just said, look, I just feel like this is not discoverable, but I want the judge to make that call. That's responsible behavior, fully in compliance with the U.S. Attorney's Manual. And the judge said it's clearly exculpatory. Well, he says later, on April 26th, excuse me, right at the hearing, Judge Mazzetti's initial reaction was it's clearly exculpatory. On April 22nd, he told you to turn it over. He does. And there's a reason. You didn't. It takes three days. And here's why. We did not. You didn't turn it over when he told you to. We did not. And Judge King, let me explain why. There is in the record. No, you didn't ask him to defer it. You didn't ask him to change his order. You simply didn't turn it over. And you didn't tell the other side you weren't going to turn it over. And you let the jury be sworn in. You let the jury be impaneled. Right. Let me explain. Very significant step in a criminal trial. It is. Let me explain the three-day delay, Your Honor. And that is why Mr. Eisenberg. It should have been explained. I know you can explain. You explained your brief. I'm not. You can explain it here today. But it should have been explained back then. It should have been done right. Well, you know, again, the reason there was a three-day delay is because there were other agencies involved with respect to releasing the information to the defendant. The judge didn't qualify it. He didn't say turn it over once you get clearance from these other agencies. He's the federal court. And he's presiding over the criminal case. And he's got a jury in the box getting ready to sworn in. And Judge Mecedes said he had no problem. He's following the court's order. Judge Mecedes said he had no problem with the timing of the disclosure. And that's in the record, Judge King. The reason there was a three-day delay and the national security chief explained this. And there's no dispute about this. We had to get approval from the national security division in Washington and from another agency to release this information to the defendant. The prosecutor released it the minute he had authorization to do that. So the fact that the judge orders it turned over doesn't authorize you to turn it over. Yes, no, we did turn it over. The court turned it over. The Article III court ordered you to turn it over and do so. We can't turn it over until we find out from Washington where they're going to go along with you. Well, with respect, Your Honor. That ain't overruled. Well, no, I want to be very careful here. He can overrule Judge Mecedes or he can overrule himself. That's right, Your Honor. But, you know, as a prosecutor, and the court is very well aware of this, you know, we can't just turn information over. I mean, we can get prosecuted for releasing classified information. We already gave it to him in the letter. Ex parte, you gave him, you told him what you were talking about. You know, the letter came on April 25th. So three days after the judge ordered us to disclose it, there were issues out of our control, that is the Maryland U.S. Attorney's Office's control, that we could not immediately disclose it. So we disclosed it as promptly as we could, which is on April 25th. And Judge Mecedes specifically said at the Brady hearing later in the trial, I have no issue with the timing of the disclosure. He had no problem with that. So the question really becomes about prejudice. And that's really what I want to focus my argument on. There is no prejudice to Mr. Madonlo when a Brady disclosure is made to him, that is, the fact that there was an ex parte communication, when that information is actually disclosed to him. This is not like every other case where the district judge limits discovery. And the issue on appeal is, oh my gosh, I should have had access to that information, because it would have changed everything. This defendant did have access to both the Brady information and the Giglio information. After the trial started, he had access. He did. And you all had it for three years before that. Well, let me address that directly, Your Honor. Mr. Madonlo never sought a continuance in this trial. Not once. He never said, stop the trial. This is Brady information. But the information you had in 2010. Yes. You turned it over in 2013. Correct. Your Honor, the reason why we didn't turn it over is because the prosecutor, in good faith, never thought it was actually Brady material. We maintain that here today. It's a different satellite program built by the Italians. It's a 100-kilogram satellite, unlike the Sina satellite, which is a 20-kilogram satellite. It never launched, unlike the Sina program, which is what this whole case is all about. And the most important thing there, the prosecution here focused on the relationship between the Iranians and the Russians. That's what the entire conspiracy charge in counts one and other counts is all about. The MESVA program is a fundamentally different satellite program. Right? Built by the Italians, which never launched. So the prosecutor, when he's looking at this information, says, you know what? This isn't even discoverable. It's not Rule 16. It's not Jenks. It's not Brady. It's not anything else. But out of an abundance of caution. He was a co-defendant. Yes. In the conspiracy charge. Correct. First indictment. And when he met with investigators, he provided us basically a 14-page memorandum, which is in this court's sealed appendix. Highly inculpatory. Inculpatory of Mr. Madonlo. Inculpatory. And there was one stray sentence that says something about this MESVA satellite back in 2000. Mr. Madonlo, which is his own statement, by the way. Right? How can the government suppress a defendant's own statement? But that's the Brady issue. I want to focus on the- Madonlo's still never seen it, right? He has seen that sentence. Yes. He's never seen the memo. And he's never sought it. That you just characterized. He has never sought it on appeal. And this court, in fact- So he's never sought it. That issue is waived. But let me focus on prejudice. So in terms of the Brady-Giglio disclosures, there is no prejudice to a defendant when he receives the information. We turn it over. So there is no prejudice to him, the fact that there was an ex parte communication. Now, the fact that he wasn't noticed, Your Honor. First of all, as I say, I'm not aware of anything in the local rules in Maryland. Rule 16 says nothing about notifying the other side. The Jenks Act says nothing about notifying the other side. None of this court's binding authority says anything. The First Circuit has cases- So you're saying you can conduct these ex parte proceedings? I think when a prosecutor is seeking advice from a district court, I don't think there's any rule requiring him to notify the other side. Now, if this court, in this case, were to suggest or to require prosecutors to do that going forward, I think the bar would welcome that kind of guidance. But this prosecutor is acting responsibly when he timely seeks advice from the district court about what should I do with this information. And he turned it over. I don't disagree with what you just said, that when he asked for the advice from the court, the problem is how he went about it. Right, without notifying the other side. And didn't notify the other side. And let me- That's what you're supposed to do. It's an adversary system. Yes. Particularly a criminal case, when you're getting ready to go to a criminal, it's an adversary system. You got lawyers on one side, you got lawyers on the other side. The system only works when it's permitted to work. I do not dispute that, Judge King. And let me persuade you, that never has a court reversed a criminal conviction, let alone after a six-week trial, based on lack of notice to a defendant regarding discovery disputes. It's never happened. Let me tell you that. We've had a lot of people come in and argue, this has never happened before. Until they get the opinion. Well, I don't want to suggest that, Your Honor. But let me just say this and be very clear about it. You know, the defendant has talked about the right to receive notice of the filings. And as I say, there's two related claims there. There's a First Amendment claim, a sort of a right to public proceedings. And there's a Sixth Amendment claim, the defendant's right to have sort of the public scrutinizing what's going on. Those decisions uniformly relate to critical stages of the proceeding. Well, that's one that's been raised here, the defendant's rights. Yeah. The very First Amendment rights. Well, he decided Washington Post. Well, the case talks about what you do when you want to seal something or you want to conduct an ex parte proceeding. It lays it out for you. That case relies on the First Amendment. But what we're talking about here is what you have to do to give a defendant a fair trial. We're talking about a criminal trial. Right. Criminal trial is not a sporting event or something. It's not, Your Honor. But the reason why, again, reversal is not warranted here. You know, in every one of these cases, I'm talking particularly about Waller, Supreme Court case, Waller versus Georgia. You know, the suppression hearing in that case was not open to the public. And the Supreme Court did not reverse. And this is really my most important point in relation to this. The remedy in these contexts is not to reverse the conviction. What happened in Waller was the Supreme Court remanded the case for a new suppression hearing. And the court said, if the result of the suppression hearing, this time in public, or, you know, open to the public, is the same, the conviction is untouched. There is no new trial. And in every one of the cases, you know, the defendant has cited a number of cases here. You know, Kennedy is a Second Circuit case where the district judge, a criminal case, mailed in the written verdict rather than announcing it at open court. The Second Circuit did not vacate the convictions there. It sent the case back for the judge to announce the verdict in open court and left the sentencing in place, did not reverse. In Owens, the First Circuit case, you know, where the jury was closed, jury selection was closed for a day. Everyone agrees jury selection is a critical stage of the proceedings, unlike here. To be fair to say, in the oral argument, you're going to, you're raising harmless error. Well, lack of prejudice, yes. Lack of prejudice. Correct. So you didn't argue that in your... Well, I think our brief is pretty replete with arguments about why he wasn't... He didn't do anything wrong. Well, he wasn't prejudiced, right? So with the Brady gateway issues... That's your title statement. That's right. I mean, well, that's my position. You know, as far as the, and let me talk about the MLAT cover letter and the Swiss depositions. You know, it's pretty fact-intensive, Your Honor, but I do want to talk about this because there is no suggestion here that any of these rulings affected Mr. Madonlo's rights at trial. May 9th, 2012, there's an extensive hearing about the MLAT materials. These are the Swiss foreign records. And there's a hearing about the defendant's motion to compel discovery. Now, let me back up for a second. The defendant admitted in open court at this motions hearing that he had no entitlement to any of these materials. It's all discovery, right? It's the underlying records to the MLAT request. He had absolutely no right. It's not Rule 16. It's not Jencks. It's not Giglio. And there is no constitutional right to discover it. We all know this. He has no right to these materials. And he says that. He basically throws himself at the discretion of the district judge and says, Judge, I want to be able to attack these depositions in Switzerland. And he says, without any basis in the evidence, I believe that the U.S. government got these depositions under false pretenses. So I want to discover the entire case. I want to discover all of the emails between the U.S. prosecutors internally and the prosecutors between the U.S. and the Swiss so that I can then go to Switzerland and attack these depositions. And Judge Massetti says, look, you're not entitled to this stuff, but I am willing to give you a hearing. I am willing to review these materials in camera, ex parte, and make a decision because the government had asserted work product. We said he has no entitlement to these materials because they're internal emails, right? So let's be very clear about that. We then submit the materials on May, on June 6th. And that's the so-called MLAT cover letter. It's at page two of the sealed supplemental appendix. That cover letter is an index. Again, the defendant had noticed he knew that Judge Massetti had ordered and there's an order on the docket, page 135 of the joint appendix where Judge Massetti said, government produced these materials to me in part, ex parte, in camera because he's not entitled to it, but I'm going to review it to see if he's got a right to it. We do that. That's the part that he said you didn't give all of them to the judge. Yeah, that's what he said. You gave him a sampling. Yeah, and we were forthright about that. And Judge Massetti said, and I think to be so. Now, when you say you were forthright about it, you told the defense that, that you'd pick, decide to pick and choose which emails to show. So let me answer that, Judge Cratchler. Judge Massetti at the hearing on May 9th, he said, and this is at page 56 of the hearing transfer. We should have emphasized in our briefing we didn't. I apologize for that. Judge Massetti said, I hate to review two or three thousand pages to figure out what's going on here, but at least it feels like I need a look of these materials when you, Mr. Prosecutor, make statements like work product. So Judge Massetti said on the record, don't send me thousands of pages. This is page 56 of the hearing. Is that an ex parte? No, no, this is an open hearing. This is on May 9th, 2012 in open court. Are you saying that the judge gave you the authority to pick and choose which emails you want to show him? Well, I'm saying he said I want a look. No, what's the answer to my question? You're saying that the judge gave you the authority to pick and choose which emails to show. Well, yes, you know, when I read this statement, I hate to review thousands of two or three thousand pages to figure out your assertions about work product. It feels like I need a look to decide whether or not the work product assertion is correct. And that would have been clear to the defendant. Who's there at the hearing that you're going to be picking and choosing which emails? I don't think that's clear. Now, I don't disagree with that, Judge Faxler. I don't disagree with that. But then when we. I don't disagree with your statement, Your Honor. And then when we produce the materials on June 6th, we sent a cover letter to Judge Mattetti saying very clearly there's over a thousand pages of emails here. I know, but the question is, what does the defense know is going on? My understanding from their representations is that you're going to provide all the correspondence, all the emails to the judge. And that's what is they're expecting him to be shown and the documents on which to base his ruling. And then they found out later on, well, we didn't show him all the emails we we went through and we picked the ones out we wanted to show him and we gave him those. And then he issued a favorable ruling. That's right. And let me address that directly, Your Honor. Again, we had asserted on the record work product protections for all of this stuff. And so when we produced it to the judge, we said we're providing samplings. Is that a letter to the judge? Yes. That went to the other side? No, it did not go to the other side. I'll admit that. But here's the thing, Your Honor. It goes to the judge. He then reviews the materials in camera and announces in open court. Why didn't you give him a copy of the letter? That's the point. Well, you didn't have to give him all this. I mean, get the other side, the copy of the letter. You didn't have to give him what you gave the judge, but you ought to give him the letter. Well, that's the way the adversary system works. I understand that, Your Honor. But again, you put it in the file, put it in the court file, and then it's up here. You don't have to try to create it 18 months later. Well, you know, again, we have obviously voluntarily supplemented the record because we wanted this court to have an opportunity to look at the letter. And it's in your appendix. It's in the sealed supplement. I thought it was in response to their motion. No, no, no. We've all, you know, there was no motions filed in the district court about completing the record. We did it jointly and voluntarily. You did? Yeah. And then we entered a stipulation. That was a motion. We had to file a motion. Who brought up the issue that the record was incomplete? They brought it up with us. They brought it up to you. And then you, and so y'all worked that through that. Yes. Well, that's admirable. Essentially, we were happy to do that. But here's why there's no prejudice, Your Honors. And again, I don't want to get stuck on this. On July 24th, 2012, after Judge Massetti has reviewed the materials, he announces in open court, Mr. Madonlo, I have reviewed these materials in camera. You do not get access to the internal correspondence because it's work product, just like the government said back at the hearing on May 9th. So he had noticed that we had submitted these materials, right? He didn't object. He didn't dispute. He was glad that Judge Massetti had reviewed materials to which he never had any entitlement to in the first place. But this is a discovery dispute about internal government emails. Judge Massetti then ordered the government to produce certain materials. So he got relief. Mr. Madonlo got relief. We did turn over certain supplemental MLAT materials, which again, we had no obligation to turn over. It's not discoverable material. But having reviewed the stuff that we provided in camera ex parte, Judge Massetti said you must turn this over government certain things and the rest of it is legitimately protected by the work product doctrine. Now, let me be very clear. Mr. Madonlo has not challenged that ruling on appeal. And it speaks volumes about it because he had every basis to go to Switzerland and attack those depositions. Remember, the whole point here is for him to get discovery about internal communications so that he can then fly to Switzerland and attack the depositions in Switzerland by saying the government somehow lied to you in getting this MLAT request. He had that opportunity. He went to Switzerland and the record is very clear about this. He contested dual criminality in Switzerland. And there's a letter in the record that the defense counsel sent to the Swiss prosecutor saying this whole thing is illegitimate because no dual criminality. The Swiss took the extraordinary step of ordering us to respond to that. And there's a letter in the record, September 24th of 2012, that we send. This is after all of this, where we send to the Swiss prosecutor saying there is dual criminality and here's why. So this issue, Judge King, because I appreciate the court's questions on it and Judge Fassler as well, as well as Judge Davis. You know, he was not prejudiced because he had every opportunity to contest the Swiss depositions. That's my whole point. This is a pretrial discovery dispute where he is not appealing the ultimate order. The ultimate order that Judge Massetti said that issued has never been challenged on appeal. He has never alleged an abuse of discretion because he knows that Judge Massetti, it was an act of grace to even give him what he gave him, right? All of this stuff is non-discoverable. So that's the MLAT cover letter. Now there's the issue about the depositions. And I don't want to get too much into the facts, but this is important. The Rule 15 depositions. There's a hearing on this in late December of 2012. And again, in open court, there's a discussion there about the defendant, again, seeking all discovery. He wants all of the witness statements in advance of the deposition because he wants to basically cross-examine the defendants. He has no entitlement to that information under the Jenks Act, right? You only get it at the time of the guy testifies. And under the discovery agreement in this case, we only had to turn those materials a week in advance. On December 27th, there was a lengthy hearing about the depositions. And again, the defendant asked for all of the discovery in this case. And Judge Massetti says, why do you think you're entitled to this? Why are you entitled to all of the discovery in the case? You are not entitled to this material. If you think you're entitled to it now, let me review these prior witness interviews in camera ex parte, and I'll tell you whether or not you have an entitlement to it early. At that very same hearing, and again, this is in court, in open court on December 27th, Judge Massetti rules on the materiality of the upcoming depositions. He says this is an important part of the government's case to determine the extent to which Prospect Telecom was in fact formed as part of the conspiracy to conceal payment of money, etc. So it is relevant in that regard. So there is an in court on the record finding made by the judge on December 27th before we sent anything to chambers saying these depositions are material. And of course, the defendant has never challenged that on appeal. Why would he? Those depositions buried him. He knows they're material. He knows those depositions were relevant. There were a critical part of the government's case. Judge Massetti again in open court said these are material and then he enters an order on December 28th, a formal docketed order saying I am granting the Rule 15 depositions. This is at page 1350 of the Joint Appendix with certain conditions. And that's one of them is produced these witness interviews to me in camera because the defendant is not entitled to them at this point. So let me determine whether or not in fact there were any assertions of privilege or there was any materiality issues. We produced the information on January 3rd, 2013 with a two page cover letter and it is not, Judge King, a letter brief. It is simply a two page cover letter go to the other side. It did not. It did not because it accompanied what Mr. Madonlo knew about in open court that he was supposed to receive an ex parte. Do you admit today it should have gone to the other side? I'll say that again, Your Honor. Do you acknowledge it should have gone to the other side? You know, standing here today, I wish we had done it to the other side. Pardon? Standing here today, I wish we had sent it to the other side just because it would have mitigated a lot of the issues on appeal. But the question is, did it prejudice Mr. Madonlo? And my suggestion is there was no prejudice to the defendant where Judge Massetti had already granted the Rule 15 depositions and Mr. Madonlo on appeal has never challenged that decision. So the question is, how was he prejudiced? How are his substantial rights affected by the fact that these Rule 15 depositions were standing here today clearly were material. There's no dispute about that. The Housher testimony and the Zahedi testimony buried Mr. Madonlo. He's never challenged that decision on appeal because Judge Massetti clearly properly granted the depositions. So did this cover letter somehow sway Judge Massetti? No, because he had already granted the motion. He had already said on the record on December 27th, 2012, these are material. So let me just focus on those two contexts, Your Honor, because I know my time is running down. I want to persuade this court, you know, again, if we had to do it all over again, we would have noticed the other side. There's no doubt about that. Even with the Brady and the Giglio stuff, you know, it's important. And we say it in our brief and I'll say it now. The government has no interest in the adversary process in any way being compromised. You know, we're a party to every single federal criminal case in this country. We have an interest in making sure that we're noticed about everything that's going on, right? But there are legitimate instances where ex parte contacts are appropriate. You know, when a defendant has a problem with his lawyer, there are and they don't they don't dispute that with you. They don't dispute that with you. There are. But there's got to be done right. It's got to be done right. And the question is, and I hope the Justice Department is not doing this thing pervasively around the country or that you're not doing it this way. Generally, in the District of Maryland. But what I want to persuade then you come in here and what do you. I used to work for Judge Field. He said that when the government gets in trouble, comes in and argues the clearly guilty rule. Well, we mess it all up, but I'm not going to say clearly guilty, guilty. We have an obligation to go on. We have an obligation, perhaps higher than any other party to do the right thing, Judge King and Berger versus United States says that. And I stand here and I embrace that. But the question that ultimately in this case is, was there any prejudice to the defendant in ex parte contacts that had nothing to do with what was going on a trial? Right. The cases where convictions have been reversed all have to do with the admission of evidence during an ongoing trial. That's the language in rhymes. None of that happened here where every single one of these issues was openly, aggressively, zealously litigated in open court. The Swiss MLAT issue. I mean, there are untold number of docket entries about the MLAT records. Right. And Judge Misetti had essentially, you know, it's a purely discretionary issue. And that's my point. It's about discovery. And he had no entitlement to any of this stuff. There's no dispute about that. The underlying MLAT materials, the internal emails between U.S. prosecutors and the Swiss prosecutors, he's got no entitlement to that. But Judge Misetti fairly entertained the question, should I look at the- He was entitled to notice when you were communicating with the court, those letters you're talking about, that you said you weren't. He was entitled for sure to the Brady material. Yes. He was entitled to it when the judge said he was entitled to it. You mean in terms of producing it? Absolutely. Yeah, I don't dispute that. He was entitled to have it produced immediately when he got it. Right. Three years before. He was entitled to it then. The court has heard me- He certainly was entitled to it when the judge said, turn it over. Well, that raises the question whether in fact it was Brady material. And now we've, you know, I think the strongest position for us in that respect is a defendant's own statement. And after all, this is Mr. Madonna's own statement to a co-conspirator. He's not suppressed. The government can't suppress the defendant's own statement. And that's probably the easiest and the clearest way to resolve that discovery issue. Now, the defendant says, well, you know, this was 10 years ago. Well, I haven't seen a single case suggesting that somehow, you know, there's a time expiration on a defendant's own statement. So that's why none of it's Brady. You know, that's why even if it, you know, whether the timing happened or didn't happen, ultimately, if you find that this isn't Brady material, all of that's really kind of irrelevant. The key point, Your Honor, and again, I don't want to get caught up on this three-day delay, but the record is, you know, it's clear on this. We did not have authority to release it until the 25th, and that's all I can really tell you. And there's a summarized, you know, there's a classified summary in this court's docket explaining kind of what the issue is. If the government writes the letter to the court, and they should have notified the other side, but when they did it, when they write a letter to the court and say we got some material, it may be Brady. We don't think it is. They got to be ready to turn it over when he says to turn it over. Yes. You can't say, no, Judge, we can't turn it over yet. Well, we got to go check with the people down in Washington. Judge King, I think you need to look. Judge King, I want to be very clear about this, and unfortunately, I don't have the record, the letter right on me. But the very last. I'm nitpicking with you there. No, no, no. But the very last sentence, let me be forthright, Judge King. The very last sentence in that letter from Mr. Salem to Judge Mazzetti on April 22nd, 2013, if the court orders disclosure, I will notify you if there's any issues about any other agencies. He says that. He says that. And he is open about it with Judge Mazzetti. I don't have it right in front of me, but it's the very last sentence in that letter, and you'll see it. There were issues in terms of releasing this information to the defendant immediately. We got the authority. Brady material, you got an obligation on the Constitution to provide it to the defendant. Yes, and we did. And do you have an obligation to provide it to him immediately? Well, I haven't. You could have been providing it three years before. Well, Judge King. Because you say we didn't see it. With respect. I didn't see it, but you've got an obligation. Let him finish before you start talking. Yes, Your Honor. Works a lot better that way. Did you have anything? All right, now go ahead. And if I may just respond, Judge King, you know, the court is aware of our position that it isn't clearly exculpatory. It's a different satellite program. What the judge ruled, that's resolved. Well, the judge ruling. Well, you didn't appeal that. We don't need to because. You know, we can't appeal it. No, no, that's right. Well, it is exculpatory. I've looked at it all. Fair enough. I've looked at it all. I've spent an inordinate amount of time studying on this case, I think. And I've looked at it. I think it's exculpatory. Fair enough, Your Honor. Clearly exculpatory. If it's clearly exculpatory. As a judge, as a prosecutor, as a defense lawyer, it's exculpatory to me. Fair enough, Your Honor. The question then becomes. I think it's admissible. Was it suppressed or was it? Well, and if it is admissible, Judge King, you know, the defendant never made any use of it. He had a month of the government's case with which to cross-examine witnesses with this information. He put on his own case and he never took advantage of it. In fact, the one time he cross-examines using this information, he gets an answer that he doesn't like, right? He cross-examines the government's expert, Mr. McDowell. Mr. McDowell says MESPA is different. MESPA is not SIN-01. MESPA is an Italian satellite, 100 kilograms, which is different than the 20-kilogram satellite we're talking about. So it's not, it wasn't suppressed, right? Because it's the defendant's own statement. So I understand the point, Judge King, that you're making about disclosure and the need to provide this information, but that all assumes that it actually is Brady material. And that's a very high standard. And putting aside the fact that we did turn it over, which is important. I don't think it's such a high standard. I think prosecutors on there will recognize it. And Judge Bassetti recognized it. And I don't have any trouble recognizing it. And the question- It's adulterated material, and it should have been turned over. Fair enough, Your Honor. It was eventually turned over. That's right. It was turned over, so it wasn't suppressed. And the ultimate question, and this is the U.S. Supreme Court, you know, in Bagley, the petitioner's burden, Mr. McDowell's burden, is to show that in light of all of the evidence, including that untainted by the Brady violation, in other words, everything else at trial, it is reasonably probable that a jury would have entertained a reasonable doubt regarding petitioner's guilt. That is the materiality standard under Brady. And the court's aware of that. Judge King, I appreciate that. I won't spend a lot of time on that. Even if you find that it's clearly exculpatory. Fair enough. Was it suppressed by the government? No, because it's his own statement. We did not suppress it. And then putting aside that issue, we turn it over. And he had a month with which to use that information on cross-examination and then he put on his own case. In fact, he called one of the government's case agents who was present at the necessary meeting. Didn't ask her about it. But he knew this didn't help him, Your Honor. That wasn't his defense at the end of the day. So I know my time is running, Chief Judge Fraxner, I appreciate. But if I could just make my last sort of point here. At the end of the day, as Judge King and the court has observed earlier, the issue with ex parte contacts is whether or not there was prejudice to the defendant, right? Did it affect his fair trial? Was a critical stage of the proceedings somehow subverted or corrupted by whatever ex parte relationship happened here? And I would submit to the court in this six week difficult criminal trial, all of these contacts with the national security thing is a little bit on the side because it didn't even deal with the Brady issue ultimately. None of those contacts had any material effect on the issues at trial. It's all about discovery. The MLAP material is all about whether or not he gets internal emails and the deposition letter is up. Does he get early Jenks material, right? Does he get his hands on those witness interviews three months before the depositions or just one week as the parties had agreed in their discovery agreement? It's all about discovery. And I want to be careful, Judge Fraxner, but I have never seen a case. I'm not familiar with any opinion that has reversed a criminal conviction based on a pre-trial discovery dispute. I'll be very sincere with the court. I've never seen it. And the reason why is because it doesn't go to the fundamental fairness, the critical stage of the proceedings. You know, that's where the Sixth Amendment right attaches. Mr. Madama was able to contest these discovery rulings in open court. At Infinitum, there are lengthy motions hearings where the parties argue about the MLAP materials as well as the Swiss depositions. Ultimately, Judge Massetti ruled against the defendant and he has not challenged any of those decisions on appeal. Not once has he said the district judge abused his discretion in the MLAP materials or the depositions. I don't want to go on and on, Your Honors. I appreciate it. Thank you very much. All right. I'd like, if I could, to just try to clear up a couple of issues relating to the MLAP correspondence and the Swiss depositions. I think it's actually pretty straightforward. There were orders issued on the public docket as to each. As to the MLAP correspondence, the first order was issued on May 29th, 2012. This is page 135 of the Joint Appendix. It says, ordered that the government shall deliver to the court for in-camera review, and I'm skipping, all correspondence between the government and authorities of Switzerland and the Russian Federation in connection with the government's MLAP requests to those countries. After that order was issued, there was the submission of exemplars, not all of the correspondence. Then, on July 27th, Judgment City ordered, issued an order on the public docket that says, this is page 184 of the Joint Appendix, I order dated May 29th, 2012. That's the order I just read from. The court directed the government to deliver for in-camera review, and I'm skipping, all correspondence between the government and authorities of Switzerland and so on. The government has submitted to the court, and the court conducted an in-camera review of those documents. We didn't know that those documents, meaning all of those documents, were not submitted to the court until Mr. Madanlo had been sentenced to eight years in prison. That is all the public docket shows as far as the MLAP correspondence is concerned. As far as the Swiss depositions are concerned, there were again two, a few orders actually. One was issued, this is an order on the public docket, December 28th, 2012, page 1350 of the Joint Appendix. In relevant part it says, the government's motion to conduct depositions pursuant to federal rule of criminal procedure 15 is granted, subject to the following. Then over to the next page, 1351, I'm skipping, the government shall promptly obtain from the Swiss government, and if possible, from the proposed opponents, an indication that the opponents have waived any legal privileges under Swiss law, including any right against self-incrimination, attorney-client privilege, or other legal privileges that they may assert during the depositions. After this order is issued, the government makes its ex parte submission, which the exact substance of which we to this day don't know about, we the defense, but according to the government's public briefs in this case, it had something to do with whether Swiss witnesses would assert privilege. Then another order on the public docket, January 17th, 2013, this is page 1353 of the Joint Appendix. Because the government has adequately complied with a condition set forth in this court's order dated December 28th, 2012, the order I just read from, the government's motion to conduct depositions pursuant to federal rule 15 is granted, no longer conditional because it's got that representation. Part of which was, undeniably, that ex parte submission that nobody knew anything about. My friend, Mr. Rahman, has suggested that both of these issues were litigated extensively. I don't deny that, but his position ultimately seems to reduce to the idea that if 75 or 80 or 90 percent of litigation is adversarial and five or 10 or 20 or 25 is secret, that's just fine. That's obviously not just fine and that's the basic problem here. Let me say a little bit, if I could, about another important part of Mr. Rahman's submission to the court, which is that these relate to discovery and we're not challenging the underlying discovery rulings. It seems to us, with all due respect, that that is just a colossal non sequitur. Our point is not that if there had been an appropriately adversarial presentation on these issues, one of which, as I've said and as we say in our briefs, determined whether the trial would go forward and if after that adversarial presentation, the judge in the exercise of his discretion had come out in favor of the government and against us, that we would be able to argue that it was an abuse of discretion. Maybe it would be, maybe it wouldn't. Our point is that it wasn't an adversarial presentation. He made these discretionary determinations on the basis of a submission from only one of the parties. We don't have to appeal the ultimate decisions to be able to come to the court and say that they were made in a profoundly constitutionally impermissible way. Mr. Rahman suggested that there's no problem here because discovery disputes aren't critical stages of the proceeding. What I would say is that at most, even if you accept that, that goes to whether this could be structural error or not. The RZS Holdings case, which Judge King and I were discussing when I stood up here a while ago, was a civil case. Obviously, Sixth Amendment and Fifth Amendment trial rights aren't implicated in the civil case and the court reversed in that case. At the very least, we've got a due process problem here and the government, for the reasons I've already explained, can't show an absence of prejudice whether or not this is structural error. As far as Brady is concerned, my friend Mr. Rahman said a lot about how the exculpatory comment related to a missile system that differs from the one that Mr. Madanlo was ultimately tried for and convicted of brokering. And I have to say, I've always found that and a rather remarkable assertion when one considers that in the government's own rebuttal summation, after we had argued that Mr. Madanlo should be acquitted because the missile system that was ultimately launched was not the one we brokered, the government said, don't worry about the names of these different missile systems. It's all the same thing. That at bottom was their submission. One was a draft or an early version of the other. I don't see how they can now say that there was no Brady violation because it involved a different system. When that was their theory that they put before the jury and it has to be presumed that the jury agreed with it in finding Mr. Madanlo guilty. One last point on Brady, if I could. The point Mr. Rahman made is that what do we have to complain about when this was actually disclosed? The complaint is not over its disclosure. It's over the timing of its disclosure. And the problem is that it was disclosed too late before we could make any meaningful use of it. The jury had been impaneled. The trial had started. The witness was overseas. After the disclosure was made, the witness wrote a letter to the court saying, if I had known that this was going to be disclosed, I would have agreed to have my deposition taken. When the jury has been impaneled and the trial has begun, it's completely unrealistic and impractical to think that we could have moved during the course of trial for leave to take Rule 15 depositions of this witness who was abroad. And either the trial would proceed without us, I don't exactly know how that would work, or there would be this extended adjournment in the middle of trial after the jury had already been impaneled. I have a question I want to ask you. This will take you off track. Do we factor in at all the fact that the judge felt this was OK, these acts were OK, these examinations were OK, these contacts were OK? Is that a factor to enter into our decision? I guess I would say two things about that. One is no. I think this is an asserted constitutional error review as de novo. But second, and really more fundamentally, it would be one thing if the judge had actually been asked to rule on the permissibility of having ex parte contacts. But he's presumed to know the rules of ethics and what's permitted, what's not permitted, and he went on and did these things that you assert are, I guess, unethical. Well, you know, we're here to assert the constitutional rights of our client. And I understand that, and you're doing a good job. And whether these violate ethical canons or not, it's not for me to say. What I would say is that they violated our client's constitutional rights. I'm just curious. Do you have any questions? Okay. Thank you. Thank you. Ed, you finished. I had. Thank you.
judges: William B. Traxler, Jr., Robert B. King, Andre M. Davis